# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROSE MAKINSON, | ) | |
| | ) | CASE NO. 5:12CV2643 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Rose Makinson ("Makinson") challenges the final decision of the Commissioner of Social Security, Carolyn W. Colvin[1] ("Commissioner"), denying her claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) & 423.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

---

[1]  Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013; and, that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  (Doc. No. 18 at 1.)  Plaintiff does not object.

## I.  Procedural History

On November 3, 2009, Makinson filed an application for a POD and DIB alleging a disability onset date of October 25, 2007 and claiming she was disabled due to severe anxiety, depression, stomach problems, and arthritis.[2]  (Tr. 144-145.)  Her application was denied both initially and upon reconsideration.  Makinson timely requested an administrative hearing.

On May 5, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Makinson, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 30 - 57.)  On June 2, 2011, the ALJ found Makinson was able to perform past relevant work as a hospital unit clerk and, therefore, was not disabled.  (Tr. 10- 19.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

### Personal and Vocational Evidence

Age forty-seven (47) at the time of her administrative hearing, Makinson is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has a high school education and completed two years of college.  (Tr. 35, 150.)  She has past relevant work as a unit clerk in a hospital.

### Hearing Testimony

At the May 5, 2011 hearing, Makinson testified to the following:

---

[2]As discussed *infra,* Makinson filed a prior application on August 4, 2004 for a POD and DIB, alleging a disability onset date of December 19, 2003.  (Tr. 61.)  After her application was denied initially and a hearing was conducted on August 16, 2007, the ALJ in that case issued a written decision dated October 24, 2007 finding Makinson capable of performing her past relevant work as a hospital unit clerk and, therefore, not disabled.  (Tr. 61-68.)  It does not appear that Makinson appealed this ruling.

2

- She graduated from high school.  Several years later, she obtained a two year associate's degree in medical assistance technology from a community college. (Tr. 35-36.)

- During the time period between October 25, 2007 and December 31, 2008,[3] her neck, arm, shoulder and back pain was worse than it had been previously.  (Tr. 37-39.)  She had frequent flare-ups of her fibromyalgia, "where all of my muscles and my body would just ache uncontrollably with muscle spasms and burning and just all over."  (Tr. 39.)  She experienced "horrible pain that kept me from really doing anything."  (Tr. 39.)

- In 2007 and 2008, she was unable to cook meals because it was too difficult for her to stand for more than 10 to 15 minutes.  (Tr. 40.)  Her husband cooked, shopped, fed the dogs, and did the laundry.  (Tr. 40.)  Her daily activities included straightening up, doing the dishes, resting with the dogs, watching TV, and writing in her journal.  (Tr. 40.)  During this time period, she did not sleep well, generally getting only 1 to 4 hours of sleep each night.  (Tr. 40-41.)

- In the summer of 2008, she had a series of lumbar epidural injections.  (Tr. 41.) They gave her some relief but did not allow her to do more around the house.  (Tr. 41.)

- In 2007 and 2008, her pain level was generally between 7 and 10, even with medication.  (Tr. 45-46.)  She experienced a pain level of 10 at least once per day. (Tr. 46.)  Generally, her pain level was lower in the morning and then progressed as the day went by.  (Tr. 46.)  Her most comfortable position was lying down with a pillow underneath her knees.  (Tr. 47.)  She would lie down "several times throughout the whole day until bedtime," generally for about 20 to 45 minutes each time.  (Tr. 47-48.)

- At the end of 2007 and through 2008, she was having panic attacks a couple of times per week.  (Tr. 43.)  She did not socialize with friends, drive, go for walks, or read.  (Tr. 44, 47.)  She experienced mood swings and crying spells.  (Tr. 44.) When this happened, she would go in her room and shut the door.  (Tr. 45.)

- As of January 2008, she was taking a number of medications for her mental impairments, including Trazedone, Ceraquil, Welbutrin, Paxel and Ativan.  These medications were for her anxiety issues, panic attacks, bipolar disorder, sleeping problems, and depression.  (Tr. 42.)

---

[3]  During the hearing, the ALJ focused questioning on the time period after the prior October 24, 2007 ALJ decision through Makinson's date last insured of December 31, 2008.  (Tr. 36.)

3

- As of the date of the hearing, both her fibromyalgia and her psychological condition were worse.  (Tr. 48-49.)

During the hearing, the ALJ indicated that "I'm going to adopt [the previous ALJ's] characterization of the past relevant work as the unit clerk in a hospital," noting that "it was performed at the light level of exertion and was semi-skilled in nature."  (Tr. 50.)  He then posed the following hypothetical to the VE:

> In the hypothetical number one, please assume [Makinson's] vocational profile, age, education, and past relevant work.  Also assume that she can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and/or walk with normal breaks for at least two hours in an eight-hour workday.  She can sit with normal breaks for about six hours in an eight-hour workday.  She has no limitations in her ability to push and/or pull other than as restricted by her limitations on lifting and/or carrying. She cannot climb ladders, ropes or scaffolds.  She can occasionally stoop, crouch and crawl.  She can work in a job that is low stress, meaning no arbitration, negotiation, confrontation, or influencing or be responsible for the safety or welfare of others or in a job with high production quotas.

(Tr. 51.)  The ALJ then noted that "[i]t would seem clear that she can't do the past work since it was light and this is a sedentary RFC."  (Tr. 51.)  He then asked the VE whether there were any unskilled jobs that an individual with that vocational profile and RFC could perform.  (Tr. 52.) The VE testified that such a hypothetical claimant could work as a food and beverage order clerk, sorter, or deburer/grinder.  (Tr. 52-53.)

The ALJ then added to the above hypothetical the additional restriction that the individual would "need[] to be able to alternate between sitting and standing every 30 minutes with five minutes in the alternate position at the work station before resuming the original position of sitting or standing."  (Tr. 53.)   The VE testified that such a person could perform the three previously identified jobs.  (Tr. 53 -54.)

4

The ALJ then added to the first hypothetical that the individual would be off task 20 percent of the workday.  (Tr. 54.)  The VE testified that this additional restriction would preclude all work.  (Tr. 54.)  Finally, the ALJ added to the first hypothetical the restriction that the individual would miss three days of work per month.  (Tr. 54.)  The VE again testified that this would preclude all work.  (Tr. 54.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Makinson was insured on her alleged disability onset date of October 25, 2007 and

---

[4]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

remained insured through December 31, 2008. (Tr. 11.) Therefore, in order to be entitled to POD and DIB, she must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Makinson established medically determinable, severe impairments, due to tension headaches, fibromyalgia, anxiety, depression, and, possible somatoform disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 13-14.) Makinson was determined to have a Residual Functional Capacity ("RFC") to perform a range of light work as defined in 20 C.F.R. § 404.1567(b). (Tr. 14.) The ALJ concluded Makinson could perform her past relevant work as a hospital unit clerk and, therefore, was not disabled. (Tr. 18.)

In reaching these conclusions, the ALJ (Robert King) adopted the findings of the previous ALJ (Morley White) as set forth in the October 24, 2007 decision denying Makinson's first claim for disability benefits. Specifically, ALJ King found that, because there was no new and material evidence or a change in the law, he was bound by the findings of ALJ White pursuant to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(g). (Tr. 10, 13, 14, 18.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

7

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Effect of October 24, 2007 ALJ Decision*

Makinson first argues the ALJ erred in adopting findings from the October 24, 2007 ALJ decision pursuant to *Drummond* and Acquiescence Ruling 98-4(6), because the record contains new and material evidence demonstrating worsening of her migraines, fibromyalgia, anxiety, and depression.  (Doc. No. 16 at 8-10.)  She also argues the ALJ's reliance on the previous ALJ decision was inappropriate because that decision failed to recognize that she suffered from lumbar spondylosis, cervical spondylosis, and sacroilitis. (Doc. No. 16 at 10-11.)

The Commissioner argues the ALJ "scrupulously comported" with *Drummond* and correctly found that Makinson had failed to identify any new and material evidence.  (Doc. No.

8

18 at 10-17.)  She also argues that both ALJ decisions recognized Makinson's spondylosis and sacroilitis; discussed the medical evidence; and, accommodated her symptoms stemming from those conditions in the RFC.  (Doc. No. 18 at 15.)

In *Drummond*, the Sixth Circuit held that the Commissioner is bound by its prior findings with respect to a claimant's disability application unless new and material evidence, or changed circumstances, require a different finding.  *Id*. at 842.  The Social Security Administration ("SSA") later acquiesced in this ruling.  *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4(6)").  In AR 98-4(6), the SSA stated that "[w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." AR 98-4(6) at * 3.

Therefore, under *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.  *Slick v. Comm'r of Soc. Sec*., 2009 WL 136890 at * 4 (E.D. Mich. Jan. 16, 2009).   In order to avoid the application of *Drummond*, a claimant must present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination.  *See Bender v. Comm'r of Soc. Sec*., 2012 WL 3913094 at * 5 (N.D. Ohio Aug. 17, 2012) (citing *Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230, 1232 (6th Cir. 1993)).  Moreover, a claimant "must not merely present new and material evidence, but that evidence must show that [her] condition deteriorated from the state of her

9

condition at the time the ALJ made the decision." *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988 at * 8 (E.D. Mich. July 12, 2011). *See also Casey*, 987 F.2d at 1232-1233 (holding that where the Secretary already denied a claimant's application for one period, the claimant must then show that "her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity"). Thus, a prior ALJ's ruling that a claimant is capable of working is binding upon a subsequent ALJ unless the claimant can show that her symptoms have worsened since the time of the prior decision. *See Bender*, 2012 WL 3913094 at * 5; *Salsgiver v. Comm'r of Soc. Sec.*, 2012 WL 2344095 at * 12 (N.D. Ohio June 12, 2012).

Here, Makinson filed her first application for POD and DIB on August 4, 2004, alleging disability beginning December 19, 2003. (Tr. 61.) After her application was denied both initially and upon reconsideration, a hearing was conducted before ALJ White on August 16, 2007, at which both an impartial ME and VE testified. (Tr. 61.) In a written decision dated October 24, 2007, the ALJ denied Makinson's application. (Tr. 61- 68.) Citing medical records from December 2002 to July 2007, he concluded Makinson suffered from the following severe impairments: tension headaches, fibromyalgia, anxiety, depression, and possible somatoform disorder. (Tr. 62-63.) He also found Makinson had a non-severe impairment of gastroesophageal reflux disease, and noted medical evidence indicating diagnoses of lumbar and cervical spondylitis, osteoarthritis of the spine, herniated discs (lumbar and cervical), and chronic pain. (Tr. 62-63.)

After concluding that Makinson's impairments did not meet or equal a listing, the decision assessed the following RFC:

Makinson has the residual functional capacity to lift and carry 10 pounds

> frequently and 20 pounds occasionally. She can sit and stand with normal
> breaks. She can not climb ladders, ropes, or scaffolds. She can occasionally
> stoop, crouch, and crawl. She can work in a job that is low stress (meaning
> no arbitration, negotiation, confrontation, or influencing or be responsible
> for the safety or welfare of others) or in a job with high production quotas.

(Tr. 64-65.) In so finding, ALJ White acknowledged Makinson's testimony that "she is unable to

work because of chronic pain in her neck, arms, hands, tailbone, lumbar spine, hips and feet" and,

further, that "her conditions have worsened." (Tr. 66.) He also noted that Makinson "experiences

panic attacks, memory problems, and wild mood swings." (Tr. 66.) However, he found

Makinson's statements regarding the intensity, persistence, and limiting effects of her symptoms

were not credible in light of evidence regarding her daily activities and non-compliance with

medications and treatment. (Tr. 66.) In addition, he gave great weight to the opinion of the ME,

who opined that Makinson had the physical and mental capacities set forth above. (Tr. 67.)

Finally, he concluded Makinson was capable of performing past relevant work as a unit clerk in a

hospital and was, therefore, not disabled. (Tr. 67-68.) It does not appear that Makinson appealed

this ruling.

Makinson then filed a second application for POD and DIB on November 3, 2009, alleging

disability beginning October 25, 2007 (the day after ALJ White's decision was issued). In his

written decision denying this application, ALJ King began by citing *Drummond* and AR 98-4(6),

stating as follows:

> I am bound by the finding of the previous Administrative Law Judge regarding
> residual functional capacity pursuant to *Drummond*. Even in viewing the
> evidence in the light most favorable to the claimant, there is no new and
> material evidence. Further, as [Makinson's attorney] acknowledged, there has
> not been a change in the law, etc. Consequently, I am bound to adopt the
> residual functional capacity found by the ALJ who adjudicated [the] prior
> decision.

11

(Tr. 10.)[5]  He also adopted the findings of ALJ White that Makinson suffered from the severe impairments of tension headaches, fibromyalgia, anxiety, depression, and possible somatoform disorder "because there is no new and material evidence" to the contrary.  (Tr. 13.)  For the same reason, he adopted the previous decision's findings that Makinson's impairments did not meet or equal one of the listings.  (Tr. 13.)  Based on the RFC adopted from the previous decision, ALJ King concluded that "[f]rom October 25, 2007, through December 31, 2008, the claimant was capable of performing past relevant work as a unit clerk in a hospital" and, therefore, was not disabled.  (Tr. 18.)

Makinson now argues ALJ King erred in adopting the previous ALJ's findings because the record contains new and material evidence demonstrating worsening of her migraines, fibromyalgia, anxiety, and depression.  She acknowledges the relevant time period is between October 25, 2007 to her date last insured ("DLI"), December 31, 2008.  (Doc. No. 16 at 3, 9 fn 2.) The relevant medical evidence cited by the parties with respect to this time period is as follows.

On October 25, 2007, Makinson presented to pain management specialist James Bressi, D.O., for follow-up treatment of her chronic lumbar and cervical spine pain.  (Tr. 232-233.)  She reported worsening pain that had been "rather severe" over the past several weeks.  (Tr. 232.)  However, she stated her pain medication seemed to be helpful, particularly in combination with injections, and did not request any changes in her medication.  (Tr. 232.)  Dr. Bressi diagnosed cervical and lumbar spondylosis and refilled her prescriptions for Oxycodone, Morphine,

---

[5]  The ALJ also stated that he was bound to the previous ALJ's finding that Makinson had past relevant work as a hospital unit clerk pursuant to *Dennard v. Sec'y of Health and Human Servs.*, 907 F.2d 598 (6th Cir. 1990) and Acquiescence Ruling 98-3(6).  (Tr. 10.)  Makinson does not object to this finding.

Carisoprodol, and Gabapentin.  (Tr. 232-233.)  He also noted that Makinson's "quality of life has improved secondary to pain meds."  (Tr. 233.)

On November 28, 2007, Makinson presented to her primary care physician Daniel Laszlo, M.D., with complaints of anxiety, pain, insomnia, nausea, and migraines.[6]  (Tr. 371-373.)  He noted Makinson had initially been seen for anxiety in June 2007.  (Tr. 371.)  He refilled her prescriptions for Trazodone, Esgic, Paxil, Phenergan, Ativan, and Seroquel.  (Tr. 372-373.)  On January 4, 2008, Makinson saw Dr. Laszlo for abdominal discomfort, diarrhea, anxiety, and nausea.  (Tr. 368-370.)  She did not report migraines at this visit and was described as being in "no apparent distress."  (Tr. 368-370.)

On January 28, 2008, Makinson returned to Dr. Bressi with complaints of "chronic global body pain."  (Tr. 229.)  She reported her "pain seems to be worse overall," particularly at night, and requested an additional Percocet.  (Tr. 229.)  Dr. Bressi noted that "exam is generally unremarkable with positive fibromyalgia tender points noted throughout.  Strength is equal and adequate bilaterally in the upper and lower extremities." (Tr. 230.)  He diagnosed sacroilitis, lumbar and cervical spondylosis, and fibromyalgia.  (Tr. 230.)  He refilled Makinson's prescriptions, and increased her Percocet dosage.[7]  (Tr. 230.)  On March 28, 2008, Makinson

---

[6]  Two months earlier, on September 28, 2007, Makinson presented to Dr. Laszlo for insomnia, anxiety, migraines, nausea, and itching.  (Tr. 374-376.)  With respect to her anxiety, Dr. Laszlo noted her status as "improved" and that "[r]elieving factors include medication."  (Tr. 374.)  With regard to her migraines, Dr. Laszlo indicated an onset of 10 years ago.  At this visit, Makinson reported her migraines were worsening, occurring daily, and triggered by bright lights and smells.  (Tr. 374.)  Dr. Laszlo noted that "relieving factors include prescription drugs." (Tr. 374.)

[7]  There is a reference in Dr. Bressi's January 2008 treatment notes to a previous visit with Makinson on December 10, 2007.  (Tr. 230.)  However, the parties do not cite treatment records relating to this visit or direct this Court's attention to any such records in the

reported that the Percocet helped her sleep. (Tr. 227.) She reported muscle spasms and cramping, resulting in Dr. Bressi adjusting her medications. (Tr. 227.)

On June 5, 2008, Makinson reported to Dr. Bressi that her "tail bone pain has come back." (Tr. 225.) His examination found "multiple tender points, over 14 above and below the waist front and back consistent with fibromylagia." (Tr. 226.) He noted "strength 4/5 bilateral upper and lower extremities" and "significant tenderness to palapation in the low lumbar upper sacral region and into the coccyx." (Tr. 226.) He ordered a repeat series of three caudal epidural injections, which Makinson received in July and August 2008. (Tr. 226, 210-224.)

On November 5, 2008, Makinson reported "the injections were helpful for the leg pain, but not quite as helpful as they have been in the past." (Tr. 207.) She reported "a lot more neck pain" and indicated she "does not feel she is getting good adequate pain control." (Tr. 207.) She discussed with Dr. Bressi the possibility of neck injections if her neck pain continued. (Tr. 207.)[8]

On March 31, 2010, state agency consultative expert Nick Albert, M.D., reviewed the medical evidence set forth above and concluded the RFC for a limited range of light work set forth in the October 2007 ALJ decision was still appropriate for the time period October 25, 2007 to December 31, 2008. (Tr. 677-684.) State consultative expert Esberdado Villanueva, M.D., affirmed Dr. Albert's findings on June 21, 2010, noting there was "[n]o evidence of worsening prior to DLI 12/31/08." (Tr. 703.)

---

Transcript.

[8] In January 2009, (two months after her DLI), Makinson reported to Guang Yang, M.D., for follow-up of her chronic global pain. (Tr. 204-206.) Makinson stated her low back pain was very well controlled with recent injections and medication, but that she had neck pain with muscle spasms. (Tr. 204.) Dr. Yang noted "neck pain with component of radiculitis" and ordered a series of three cervical epidural injections. (Tr. 206.)

With regard to her mental health impairments, the parties direct the Court's attention to hand-written treatment notes dated between November 2007 and February 2008, which are apparently from Chander Mohan, M.D.[9]  (Tr. 192-196.)  These notes indicate Makinson presented on November 6, 2007 following the deaths of her sister and granddaughter earlier that year.  (Tr. 192-194.)  Her symptoms included depression and sleeplessness.  Examination notes indicate she was crying and labile, and requesting Xanax.  (Tr. 194.)  In addition, the notes appear to state that Makinson "doesn't understand that her problems and emotional problems [are] due to addiction to meds."  (Tr. 194.)  Makinson was diagnosed with mood disorder, depressed.  (Tr. 194.)  She returned in December 2007 and received a prescription for Wellbutrin due to anxiety and anhedonia.  (Tr. 194.)  In February 2008, Makinson reported difficulty sleeping and stated her day depends on her back pain.  (Tr. 196.)  She stated she did not like being around people or crowds, but that her relationship with her husband had improved.  (Tr. 196.)

After the relevant period, on March 9, 2010, Dr. Laszlo completed a Medical Source Statement regarding Makinson's Mental Capacity.  (Tr. 688-689.)  He opined that her abilities were "poor" in every category on that form (i.e. making occupational adjustments, intellectual functioning, and making personal/social adjustments) with the sole exception of her ability to maintain appearance which he rated as "fair."  (Tr. 688-689.)   Although the form asked him to "provide medical/clinical findings that support this assessment," Dr. Laszlo did not do so.  (Tr. 689.)

On March 9, 2010 and June 14, 2010, respectively, state agency physicians Melanie

---

[9] While the Court finds these notes difficult to decipher, the parties appear to agree regarding their general content.

Bergsten, Ph.D., and Cindy Matyi, Ph.D., opined that they could not adopt the previous ALJ's RFC because there existed insufficient evidence in the record of Makinson's mental status since her October 25, 2007 disability onset date.  (Tr. 673, 675, 702.)  Dr. Bergsten specifically noted that there was no record of a mental status examination of Makinson between October 25, 2007 and December 31, 2008.  (Tr. 675.)

In the decision, ALJ King thoroughly discussed the above medical evidence and Makinson's hearing testimony regarding her symptoms.  (Tr. 14-17.)   He accorded great weight to the opinions of Drs. Albert and Villanueva adopting ALJ White's RFC "because they are consistent with the medical evidence of record, which did not show 'new and material evidence' since [ALJ] White's decision."  (Tr. 16.)  The ALJ gave Dr. Laszlo's opinions as set forth in his March 2010 mental capacity assessment little weight on the grounds they were inconsistent with his treatment notes during the relevant time period.  (Tr. 17.)  Finally, the ALJ gave the opinions of Drs. Bergsten and Matyi's little weight, noting that "[w]hile it is true there is a lack of substantial evidence during the relevant period [regarding Makinson's mental status], this lack of new and material evidence supports the adoption of the prior Administrative Law Judge's findings."  (Tr. 17.)[10]

 The ALJ then concluded the record did not contain new and material evidence that Makinson's conditions had worsened, reasoning as follows:

> During the application process and at the hearing, the claimant made some inconsistent statements.  For instance, the claimant testified that she was not driving during the relevant period.  However, treatment notes on January 16, 2008, indicate the claimant reported she did not do well while driving in the

---

[10]  Makinson does not challenge the ALJ's decision with respect to the degree of weight he accorded any of these opinions.

16

daytime while on Seroquel.  (Exhibit B1F/4).  Additionally, the claimant alleges that her medication levels were indicative of an increase in her symptoms because of her mental impairments.  However, on November 6, 2007, treatment notes indicated that the claimant's biggest problem was her addiction to medication.  Indeed, during that visit the claimant was noted as having medication seeking behavior.  (Exhibit B1F/3).  While not dispositive, these instances call into question the claimant's other statements regarding the severity of her alleged symptoms during the period from October 25, 2007, through December 31, 2008.

During the hearing on May 5, 2011, the claimant's representative pointed to the claimant's mental status examination findings and medication levels in treatment notes from Chander Mohan, M.D., as supporting her contention that the record contains new and material evidence (Exhibits B2F and B5F/52-57).  Additionally, [claimant's attorney] stated that the claimant's fibromyalgia also worsened.  She stated that the references to the number of tender points cited in treatment and the claimant's complaints of pain constituted new and material evidence (Exhibits B3F/22, 26, 27).  While considering the claimant's allegations and medical evidence during the relevant period, I also reviewed the medical evidence considered by the prior Administrative Law Judge and reviewed the prior decision dated October 24, 2007.  I note that the prior decision considered the claimant's mental impairments and symptoms, including a period of hospitalization for depression.  Additionally, the claimant's fibromyalgia was included in the prior decision as a severe impairment and her alleged limitations were considered in the residual functional capacity.  While the claimant alleges that her fibromyalgia has been better documented since the last decision, her allegations of symptoms remain the same.  Indeed, [ALJ] White considered similar evidence and testimony related to the claimant's pain and her treatment including epidural steroid injections, pain management with medication, and even a prescription cane for walking and stability.  (Exhibit B1A).  Therefore, I find that the medical evidence during the relevant period between October 25, 2007 and December 31, 2008, does not constitute new and material evidence that would change the residual functional capacity established by [ALJ] White on October 24, 2007.

(Tr. 17-18.)

The ALJ's finding that there was no new and material evidence demonstrating a worsening of Makinson's impairments is supported by substantial evidence in the record.  With respect to her fibromyalgia, the October 2007 decision discussed Makinson's symptoms and course of

17

treatment with Dr. Bressi, and recognized this condition as a severe impairment. (Tr. 62.) Indeed, that decision expressly noted Makinson's testimony that pain in her "neck, arms, hands, tailbone, lumbar spine, hips, and feet" had worsened during the relevant time period; i.e. December 2003 to October 24, 2007. (Tr. 66.)

Makison relies heavily on treatment notes indicating she reported worsening pain to Dr. Bressi in late 2007 and early 2008. (Doc. No. 16 at 9.) However, treatment notes from the time period addressed in the previous ALJ decision reflect reports of similar symptoms. Specifically, between June 2006 and July 2007, Makinson consistently reported pain ranging from 7 to 10 on a scale of 10; muscle spasms; increased pain in her neck and lumbar spine; and, overall chronic global body pain which she variously described as aching, throbbing, and burning. (Tr. 266, 269, 263, 259, 253, 256, 235). Examination notes from this earlier time period indicated "positive fibromyalgia tender points throughout" and treatment through pain medication and epidural injections. (Tr. 253-254, 257, 238-251.)

As ALJ King notes, Makinson's fibromyalgia symptoms between October 25, 2007 and December 31, 2008 are consistent with her previous symptoms. During this time period, she continued to report pain ranging between a 7 and 10 on a scale of 10; muscle spasms; and, chronic global pain in her neck, shoulders, hip, lumbar spine and cervical region. (Tr. 232-234, 227-228, 225-226, 229-231.) The general course of her treatment remained the same, both before and after the previous ALJ decision; i.e. pain medication and epidural injections. (Tr. 210-224, 232-234, 227-228, 225-226, 229-231.) Moreover, both Dr. Albert and Dr. Villanueva reviewed the medical evidence and concluded the RFC set forth in the October 2007 ALJ decision was still appropriate for the time period October 25, 2007 to December 31, 2008. (Tr.

677-684.)  Indeed, Dr. Villanueva expressly noted there was "[n]o evidence of worsening prior to DLI 12/31/08."  (Tr. 703.)  Makinson does not cite any opinion from a treating or examining physician to the contrary.

Substantial evidence also supports the ALJ's finding of no new and material evidence indicating a worsening of Makinson's migraines.  The October 2007 decision included tension headaches as one of Makinson's severe impairments.  (Tr. 62.)  Makinson argues the decision failed to sufficiently address her migraine symptoms because ALJ White neglected to consider (1) treatment notes from September 2007 showing worsening migraines, and (2) Dr. Laszlo's treatment records from the time period 2004 to 2007.  (Doc. No. 16 at 10.)  Whether or not ALJ White considered these particular records or not is immaterial, however, because Makinson fails to direct the Court's attention to any new and material evidence suggesting that her migraine symptoms significantly worsened after the October 24, 2007 decision.  Treatment records indicate Makinson suffered from migraines for many years prior to 2007.  (Tr. 374.)  While she reported worsening migraines during a visit in September 2007, treatment notes from November 2007 indicate Makinson was in "no apparent distress" and no changes were made to her migraine medication.  (Tr. 371-372.)  In a subsequent visit to Dr. Laszlo in January 2008, Makinson reported no complaints regarding migraines.  (Tr. 368-370.)  Moreover, Makinson does not cite any opinion from a treating or examining physician indicating she has limitations beyond those set forth in the RFC as a result of her migraine symptoms.  To the contrary, both Drs. Albert and Villanueva adopted the RFC set forth in the October 2007 ALJ decision and Dr. Villanueva noted there was "[n]o evidence of worsening prior to DLI 12/31/08."  (Tr.  677-684, 703.)

With respect to her mental impairments, the ALJ's finding that there was no new and material evidence is once again supported by substantial evidence.  The October 2007 decision notes Makinson first became depressed in 1994 and was prescribed psychotropic medications by a family doctor.  (Tr. 62.)  It discusses her history of crying spells, panic attacks, manic phases, "hallucinatory experiences," and paranoid thoughts.  (Tr. 62-63, 66.)  The decision further notes Makinson was hospitalized for eight days for depression in May 2005, and "had a mental health treating source from May 2005 to December 2006." (Tr. 63.)

Makinson argues generally that "her depression and anxiety more significantly impacted her life [between October 2007 and December 2008], causing her to avoid crowds, isolate herself from others, and experience regular panic attacks and crying spells."  (Doc. No. 16 at 13.)  These same symptoms, however, existed prior to October 2007 and were expressly acknowledged in both ALJ decisions.  Moreover, Drs. Bergsten and Matyi concluded there was insufficient evidence in the record regarding Makinson's mental impairments for the time period October 2007 to December 2008.  (Tr. 17.)  As set forth above, it is Makinson's burden to present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination.  *See Bender*, 2012 WL 3913094 at * 5 (N.D. Ohio Aug. 17, 2012).  Here, Makinson has simply failed to direct this Court's attention to any evidence of deterioration in her mental condition sufficient to avoid the application of *Drummond*.[11]

---

[11]  Although Makinson does not cite this evidence, the Court notes that Dr. Laszlo completed a mental capacity assessment in March 2010 in which he opined that she is significantly limited in her intellectual functioning and ability to make occupational, social and personal adjustments.  (Tr. 688-689.)  However, Dr. Laszlo does not indicate whether this assessment relates back to the relevant time period (i.e. October 25, 2007 to December 2008), nor does he discuss any medical or clinical findings to support such severe limitations.  For these reasons, ALJ King gave little weight to Dr. Laszlo's opinions.  (Tr. 17.)  Makinson does not challenge

Finally, the Court rejects Makinson's argument that ALJ King failed to consider new and material evidence diagnosing her with additional impairments; i.e. cervical and lumbar spondylosis and sacroilitis.[12]  Although the October 2007 decision does not identify these conditions as severe, ALJ White acknowledges that Dr. Bressi treated Makinson for cervical and lumbar spondylitis.  (Tr. 62.)  He also notes the results of a March 2005 MRI indicating spinal stenosis.  (Tr. 62.)  Moreover, in formulating the RFC, ALJ White indicates he considered all of Makinson's symptoms, including chronic pain affecting her neck, tailbone, lumbar spine, and hips.  (Tr. 65-66.)  Thus, the Court rejects Makinson's suggestion that these impairments were not considered by ALJ White or properly accounted for in the RFC.[13]

Accordingly, the Court finds substantial evidence supports the ALJ's finding of no new and material evidence that would preclude the application of *Drummond* and AR 98-4(6). Makinson's first ground for relief is without merit.

### Hypothetical

The ALJ found that, from October 25, 2007 through December 31, 2008, Makinson was

---

this finding, nor does she argue that Dr. Laszlo's assessment constitutes new and material evidence.

[12]  Spondylosis is generally defined as "degenerative spinal changes due to osteoarthritis." Dorland's Illustrated Medical Dictionary, 30th Ed. (2003).  Cervical spondylosis refers to degenerative joint disease affecting the cervical vertebrae and intervertebral disks, i.e. the neck.  *Id.*  Lumbar spondylosis refers to degenerative joint disease affecting the lumbar vertebrae and intervertebral disks; i.e. the lower back.  *Id.*  Sacroilitis is an inflammation of one or both of the sacroiliac joints; i.e. the places where the lower spine and pelvis connect. *See* http://www.mayoclinic.com/health/sacroilitis.  It can cause pain in the lower back and may extend down one or both legs.  *Id.*

[13]  Moreover, the Court notes Makinson does not cite any opinion from a treating or examining physician indicating that she has limitations beyond those set forth in the RFC as a result of her spondylosis or sacroilitis.

21

capable of performing past relevant work as a unit clerk in a hospital and, therefore, was not

disabled.  (Tr. 18.)  The ALJ explained his reasoning as follows

> I note that the vocational expert who testified on August 16, 2007, stated
> that the claimant was able to perform her past relevant work of unit clerk,
> which was semi-skilled and performed at the light exertional level.  (Exhibit
> B1A/10).  Because there is no new and material evidence, I have accepted
> the finding of Administrative Law Judge White with regard to the
> claimant's ability to perform past relevant work in accordance with
> Acquiescence ruling 98-3(6).

> I also note that even if I were to find that the record now contains new and
> material evidence and the sequential evaluation were pursued to step 5, the
> vocational expert who appeared at the hearing on May 5, 2011, testified that
> other jobs were available that could be performed under the more restrictive
> residual functional capacities which placed a hypothetical claimant at the
> sedentary exertional level with a sit/stand option.

(Tr. 18.)

Makinson argues that new and material evidence demonstrating a worsening of her pain,

migraines, anxiety and depression result in additional limitations not addressed by either the

light work RFC adopted by ALJ King or the sedentary RFC posed to the VE at the May 5, 2011

hearing.  Specifically, she argues there is new and material evidence regarding limitations on her

ability to maintain attendance and focus, tolerate interactions with others, and tolerate exposure

to lights and noise, and that these limitations were not included in any of the hypotheticals posed

to the vocational experts who testified at her hearings.  (Doc. No. 16 at 12-13.)

As set forth *supra,* Makinson has failed to cite new and material evidence demonstrating

that either her pain, migraines, anxiety or depression worsened after the October 24, 2007

decision.  Moreover, both ALJ decisions discussed the medical evidence and hearing testimony

regarding her problems with attention/concentration; difficulties interacting with others; panic

attacks; and, headaches. (Tr. 15-17, 62, 66-67.) Thus, the Court finds the ALJ properly adopted the light work RFC set forth in the previous ALJ decision.

The Court further finds that, even if the ALJ erred in adopting the light work RFC based on the hypothetical posed to the VE during the August 2007 hearing, any such error would be harmless. As noted *supra*, during the May 2011 hearing, the ALJ posed a series of hypotheticals to the VE that encompassed more restrictive physical limitations, placing Makinson at a sedentary level. (Tr. 51-54.) In response, the VE testified other jobs were available that could be performed by such a hypothetical claimant; i.e., food and beverage order clerk, sorter, and deburer/grinder. (Tr. 52-54.) Thus, the ALJ concluded that, even if he were to find the record contained new and material evidence, he would still find Makinson not disabled based on the VE's testimony that other jobs were available under this more restrictive RFC. (Tr. 18.) While Makinson complains that the sedentary RFC hypotheticals did not include limitations reflecting her inability to concentrate, tolerate bright lights or interact with others, the ALJ was not required to incorporate these limitations to the extent he found them lacking in credibility. *See Griffeth v. Comm'r of Soc. Sec*., 217 Fed. Appx. 425, 429 (6th Cir. 2007) (in fashioning a hypothetical question, the ALJ is required to incorporate only those limitations he accepts as credible). As explained *supra*, the ALJ analyzed the hearing testimony and medical evidence and found they did not support such limitations.

Thus, Makinson's second assignment of error is without merit.


## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by

substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.


                                        /s/ Greg White
                                        U.S. Magistrate Judge

Date: August 6, 2013